## Wolter's Estate

Before Van Dusen, J. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

The facts appear from the following excerpt from the adjudication of

SINKLER, J., auditing judge.—It appears from the record and the stipulation of facts that decedent by deed of trust, dated June 3, 1935, transferred 3,000 shares of the common stock of the United Gas Improvement Company to The Pennsylvania Company for Insurances on Lives and Granting Annuities and George Ovington, Jr., "together with all other property which may at any time constitute the principal of this Trust", in trust to "collect the income therefrom and the accretions thereto", and to pay the income and to hold and distribute the principal of said trust as. follows: To "first pay out of the income of said trust the sum of Two hundred and twenty-five dollars . . . per month to Lillian Seixas for . . . her natural life", and upon her death to pay the principal to such person or persons as the settlor may by his last will appoint, and in default of such appointment to pay over the same to such person or persons as may be entitled thereto under the intestate laws of the Commonwealth of Pennsylvania.

By the fourth item of the deed of trust, which is headed, "Trustees' Powers", decedent provided by paragraph (*f*) thereof as follows: "In the event of the income from said fund being insufficient at any time to pay the sum of Two hundred and twenty-five dollars . . . to the said Lillian Seixas, beneficiary, the Trustees shall upon her demand, make up such deficiency of income out of principal", upon specified notice being given to the settlor.

"Trustees shall after any deficiency in income shall occur, call upon the Settlor to make up such deficiency within two months after receipt of notice from the Trustees of such deficiency. . . . In the event of the Settlor failing to make up any deficiency in income within two months after receipt of notice thereof from

the Trustees, Trustees shall call upon the Settlor to deposit additional securities with the Trustees hereunder to the amount of securities sold or appropriated for income purposes, it being the purpose of this Trust to provide an income of Two hundred and twenty-five Dollars . . . per month to the said Lillian Seixas, beneficiary, for the term of her natural life."

The deed of trust further provides that in the event of the prior decease of settlor the terms of the deed of trust shall be strictly adhered to by settlor's heirs, executors, administrators and assigns; and that any power of appointment exercised by settlor by means of his last will shall likewise be subject strictly to the terms and conditions of the deed of trust in its entirety.

The deed of trust further provides that the trustees shall be entitled to five percent upon all income collected during the continuance of the trust, and to five percent on the principal of the trust when it terminates, and the deed of trust is declared to be irrevocable.

On the same day that the deed of trust was executed, the said Lillian Seixas executed a writing which provides, in consideration of the sum of $1 and divers other good causes "and more particularly . . . of the execution of a trust agreement wherein The Pennsylvania Company for Insurances on Lives and Granting Annuities, a corporation, and George Ovington, Jr., Esq., are named as Trustees for the benefit of the said Lillian Seixas, upon the terms and conditions and for the purposes as therein more particularly and at large set forth, copy of said agreement being hereto attached and made part hereof", that the said Lillian Seixas releases and discharges Carl A. Wolters from any and all manner of actions, claim or claims, demand or demands or any liability or obligation whatsoever arising out of an alleged promise to marry or agreement or contract in the nature thereof between the said Carl A. Wolters and the said Lillian Seixas which against the said Carl A. Wolters she ever had, etc.

The deed of trust and the release were executed prior to the passage of the Act of June 22, 1935, P. L. 450, which provides, inter alia, that "All civil causes of action for alienation of affections, except such causes as are not abolished by this act, and breach of contract to marry which have heretofore accrued, shall be commenced within sixty days after this act goes into effect"; and that "All contracts and instruments of every kind which may hereafter be executed within this Commonwealth in payment, satisfaction, settlement, or compromise of any claim or cause of action abolished or barred by this act . . . are hereby declared to be contrary to the public policy of this Commonwealth and absolutely void".

This act is inapplicable in the instant case because the deed of trust and the release were executed prior to its passage and the act plainly provides that it shall not have any retroactive effect.

It further appears that on or about June 1942 the income from the trust became insufficient to permit payment to claimant of the monthly sum of $225, and since that time has continued to be insufficient for such purpose; that because of the deficiency in the net income, the trustees, pursuant to the terms of the deed of trust, sold certain securities to make up the deficiency in the income for the aggregate sum of $5,316.11; that on June 3, 1935 (the date of execution of the deed of trust from Charles A. Wolters as settlor to The Pennsylvania Company for Insurances on Lives and Granting Annuities and George Ovington, Jr., as trustees), the market value of United Gas Improvement Company common stock was $13.50 a share and the then prevailing annual dividend rate on the stock was $1 a share; that on November 10, 1945, the approximate market value of the corpus of the trust was $33,832.13, and the current income therefrom on an annual basis $1,255.03; that neither the settlor nor the executors have made up any deficiency in in-

come or deposited any additional securities with the trustees to replace the securities sold or appropriated for income purposes, and on the contrary, they have denied any obligation to do so; that claimant is 46 years of age, having been born on January 30, 1899; and that the life expectancy of a woman 46, under the Life Insurance Commissioners' Standard Table, is 24.43 years, and under the Standard Annuity Table 33 years.

A bill in equity was filed against decedent in his lifetime, but he died during the pendency of the bill.

Mrs. Lewis claims:

"1. An award to the Pennsylvania Company for Insurances on Lives and Granting Annuities and George Ovington, Jr., trustees under deed of Charles A. Wolters, dated June 3, 1935, of $5,316.11 (representing value of securities sold to date to make up deficiencies in income).

"2. An award to the trustees of a sum equal to the difference between $108,000 (being the sum necessary to yield $2,700 per year on a 2½% basis) and the present value of the trust principal, which is $33,-832.13. This award is asked since the income will continue to be insufficient to pay her the annuity.

"3. If the relief requested in 2 is not granted, claimant requests, in the alternative, that a fund be earmarked for her protection or that a charge in her favor be made against the trust established by decedent's will."

Counsel for the accountants stated at the audit that at the time the deed of trust was entered into the Public Utility Holding Company Act had not been passed by Congress, and the UGI was very strong; and that its dividend was $1.

Counsel for the accountants points out that the part of the deed of trust on which claimant relies is item 4 (f) ; that there are no express words in that item by

which settlor agrees to deposit additional securities to take the place of those sold to make up the deficiency in income or by which he agrees in any and all events to pay the claimant $225 per month; and that the obligation to do so is not necessarily implied.

The release of Carl J. Wolters and the deed of trust are parts of one transaction, and grave error would result if they were considered independently and not together. The intention of the parties thereto, so far as it can be ascertained from the language employed, must be given effect.

There are some axiomatic principles of law that must be borne in mind. One is that all the language, if possible, must be given effect; and second, that a meaning must be placed upon particular expressions which is consistent with the general intention ascertained from all of the language employed.

The general intention, as stated at the end of the fourth item, is as follows: "It being the purpose of said trust to provide an income of Two hundred and twenty-five Dollars per month to the said Lillian Seixas, beneficiary for the term of her natural life"; and a construction must be adopted which will result in that purpose being accomplished and not one which results in the purpose being defeated.

Item 4 (f) first provides in the event that the income of the trust fund proves insufficient to pay Lillian Seixas $225 per month, the trustees shall upon the "demand" of Lillian Seixas make up the deficiency out of principal.

In the New Century Dictionary, Vol. 1, p. 395, "demand" is defined as follows: "To ask for with authority, or as that to which one has valid claim; . . . lay formal legal claim to; . . .".

It is next provided what shall be done if settlor does not make up the deficiency. The trustees are directed to "call upon the Settlor to deposit additional securi-

ties with the trustees hereunder to the amount of securities sold or appropriated for income purposes".

The word "call" is here used in the sense of making a demand, and that is one of the definitions in the New Century Dictionary, Vol. 1, p. 197.

It is not necessary to construe the word "call" in the sense that it is used in the stock market.

As pointed out by counsel for claimant, if the contention that there was no obligation on settlor to respond to the call were to prevail, the direction to make the call might just as well have been omitted.

Counsel for those opposed to the claim suggest that some effect can be given to the direction to make the call by holding that it was intended to afford settlor an opportunity to replace the securities sold for the benefit of those entitled to the principal, and leaving it to his option whether he would do so or not. But, obviously, it was inserted for the benefit of Lillian Seixas for the persons entitled in remainder were those to whom settlor would appoint by will, or, in default thereof, to those entitled to his estate under the intestate law.

Taking into consideration the expectancy of life of claimant, counsel for claimant contends that the principal will be exhausted prior to the death of claimant if there is no obligation on the settlor to replace securities sold for the purpose of making up income deficiencies.

With this contention we cannot agree. There is no present obligation on the executors to make up the deficiency of income or principal. The only express obligation of the executors is to pay income, if and when the fund set up by settlor becomes insufficient for that purpose. Decedent, himself, could not have been compelled to add to the principal of the trust, and certainly his executors are under no greater obligation than decedent himself. This is a continuing obligation and the award of the residuary estate to the

trustees under decedent's will, subject to the contingent claim, is sufficient protection to the claimant.

There remains to be considered the further contention of claimant that the trustees under the deed of trust are entitled to an award of the difference between $108,000 and the market value of the securities in the hands of the trustees, on the theory that $108,000 at 2½ percent interest thereon will produce $2,700 per annum.

The deed of trust expressly provides, first, that Lillian Seixas shall be paid $225 per month out of the income of the trust fund and the accretions thereto, and, after providing that the trustees shall call upon settlor to deposit other securities to take the place of those sold to make up the deficiency in income, it is stated that it is "the purpose of this trust" to provide for the payment of said sum to Lillian Seixas, for life.

The means provided are sufficient to accomplish the purpose of paying claimant $225 per month for life. It is the trust fund and the additions thereto that constitute the source of the payment of the income. The contention, in effect, of counsel for claimant, that sufficient principal be set aside for the payment of an annuity of $2,700 per year cannot be sustained.

The auditing judge, therefore, rules that the trustees are not entitled to an award of a fund equal to the difference between $108,000 and the market value of the securities stated in the stipulation of facts.

It is obvious, however, it may be necessary from time to time to sell other securities to make up the deficiencies in income, but as the residuary estate is hereinafter awarded to the trustees named in the will, in trust, subject to the contingent claim, claimant will be sufficiently protected by so awarding the residue.

By writing, marked "A", and hereto attached, dated January 14, 1946, Carl J. Wolters, the son of decedent, absolutely and irrevocably releases, disclaims and re-

nounces his right as cestui que trust to receive the income—"both that heretofore accrued and that hereafter accruing during the balance of my lifetime— from that part of said residuary estate which was formerly represented by a $1,000 United States of America 7/8% taxable Certificate of Indebtedness due 2/1/45 and is now represented by a $1,000 United States of America 2% taxable Treasury Bond due 12/15/52".

The cestui que trust, however, reserves any right to receive the income from all of said residuary estate except the part thereof hereinbefore specifically described.

The executors and trustees under the will of Charles A. Wolters acknowledge the delivery to them of the partial disclaimer.

The Act of May 28, 1943, P. L. 797, as amended by the Act of June 1, 1945, P. L. 1337, 68 PS §581 et seq., provides by section 1 as follows:

". . . any interest in, to, or over, real or personal property, or the income therefrom, held or owned outright, or in trust, or in any other manner which is . . . given to any person by deed, will or otherwise howsoever, and irrespective of any limitation of such . . . interest by virtue of any restriction in the nature of a so-called spendthrift trust provision, or similar provision, may be released or disclaimed, either with or without consideration, by written instrument signed by the person possessing the . . . interest and delivered as hereinafter provided."

By section 2 it is provided that an interest ". . . may be released or disclaimed either absolutely or conditionally, and may also be released or disclaimed with respect to the whole or any part of the property subject to such . . . interest."

The question presented for determination is, who is entitled to the principal of the bond and the income

therefrom, and in answering this question it is necessary to refer to the limitation over upon the death of Carl J. Wolters, and the situation which existed at the time of the making of the will and at the time of the renunciation.

The limitation over is not subdivided and the subdivision is that of the auditing judge. So subdivided, it reads as follows:

"IN TRUST upon the death of my son, Carl J. Wolters, to pay over said net income in quarterly payments unto Carl Paul Wolters and Eleanor Ida Wolters, children of my son Carl J. Wolters and Pauline Wolters, and such other child or children and issue of deceased children of my son Carl J. Wolters as may be living at the time of his death, share and share alike, the issue of any deceased child or children taking their parents share.

"until each child who shall live to attain the age of Twenty-one years (21) shall reach said age of Twenty-one (21) years.—

"IN TRUST upon the attainment of each such child of the age of Twenty-one years (21) to assign, transfer and pay over the principal from which each child and issue of deceased children were theretofore entitled to the income, unto such children and issue of deceased children per stirpes, upon the principal (sic) of representation."

Carl Paul Wolters and Eleanor Ida Wolters had both attained the age of 21 years prior to the execution of the will on September 23, 1941, and Carl Paul Wolters, Jr., the only child of Carl Paul Wolters, was born on December 13, 1943.

Eleanor Ida Wolters died intestate, without issue, on August 17, 1944.

Mr. Latta claims by reason of the renunciation that Carl J. Wolters is to be treated as if he had predeceased testator, and that the bond and interest thereon became distributable at the death of testator; and that conse-

quently Carl Paul Wolters and the personal representative of the estate of Eleanor Ida Wolters are each entitled to one half of the bond and the interest thereon.

The guardian ad litem, who is merely interested in the corpus of the estate, claims that the principal of the bond is distributable at the actual death of Carl J. Wolters.

Carl J. Wolters is the next of kin of Eleanor Ida Wolters and is entitled to her estate. Consequently, if the claim of Mr. Latta is allowed, he will receive one half of the bond and the interest thereon; and the intention of testator that he shall not receive any principal will be frustrated.

At this point it becomes necessary to refer to the limitation over in order to decide who is entitled to the renounced income and whether the bond is distributable at the present time.

The general plan of testator is that the corpus of his estate shall be distributed at the death of his son, Carl J. Wolters, but realizing that some of the children might be minors at that time and that there might be issue of deceased children, he provides that the trust shall continue for the benefit of each minor child until they respectively attain the age of 21 years, at which time the trustees are directed to pay the "principal from which each child and issue of deceased children were theretofore entitled to the income, unto such children and issue of deceased children per stirpes, upon the principal (sic) of representation". It consequently becomes necessary to determine to whom the income is given.

The testator provides that the net income shall be paid to "Carl Paul Wolters and Eleanor Ida Wolters, children of my son, Carl J. Wolters and Pauline Wolters, and such other child or children and issue of deceased children of my son Carl J. Wolters as may be living at the time of his death, share and share alike", and then provides that it shall be so distrib-

uted "until each child who shall live to attain the age of Twenty-one years".

In the opinion of the auditing judge, the words "as may be living at the time of his" (Carl J. Wolter's) "death", apply to "issue of deceased children", and not merely to "such other child or children". In other words, testator intended to give income to children and issue of deceased children, living at the time of the death of Carl J. Wolters and to provide for the issue of all the children of Carl Paul Wolters, and not merely the issue of such other children. The contention of Mr. Latta, if sustained, would result in abnormal distribution.

But the important matter is not whether the remainder is a contingent or vested one subject to open to let in other children as born and the issue of deceased after-born children, for in Willcox's Estate, 61 Montg. 93, relied on by Mr. Latta, the remainder was a contingent one.

In that case, testator provided that the income of a trust fund should be paid to his daughter for life, and after her death that the income should be paid to his granddaughter for life, and at her death, he gave the remainder to the persons who would have been entitled to inherit from the granddaughter under the Pennsylvania Intestate Law if she had died owning the principal, provided they were of the blood of the daughter. The granddaughter renounced her interest in the trust and thereafter the court awarded the income to her five children. After receiving income for several years, the children applied to the court for the termination of the trust. The granddaughter was still living at the time of this application. As in the instant case, there was a possibility of other children being born to the granddaughter. The court held that the renunciation of the granddaughter was equivalent to her death; that the remainders were accelerated; and the principal was distributable among the five daughters.

In construing the language of a will, a prior decision is not binding upon the court where the language employed or the circumstances existing at the time of the execution of the will are unlike or substantially dissimilar.

In the instant case testator evinces an unusual solicitude for after-born children and the surviving issue of a deceased child or children; this was not so in Willcox's Estate, supra.

Furthermore, in Willcox's Estate the court was asked to distribute principal to living persons and not like in the instant case to a living person and the personal representative of a person who had died prior to the renunciation.

The intention of testator that distribution of principal be made to living persons can be carried out without any difficulty.

The auditing judge is consequently of the opinion that the principal of the bond is not distributable at the present time and that it must be retained until the death of Carl J. Wolters.

With respect to the income, it must be borne in mind that testator made a complete disposition of his estate, and intended income to be paid to living persons. Under the circumstances, the auditing judge hereinafter awards to Carl Paul Wolters the income on hand, and directs that all future income shall be paid to him if living at each quarterly distribution and until any other child or children are born to Carl J. Wolters, in which case, distribution shall be made to him and such other child or children, share and share alike. . . .

*Glenn C. Mead* and *R. W. Archbald, Jr.*, guardian and trustee ad litem, p. p., for exceptants in re: Claim under deed of trust.

*James A. Montgomery, Jr.*, of *Pepper, Bodine & Stokes*, contra.

*Cuthbert H. Latta,* for exceptant in re: Construction of will.

*R. W. Archbald, Jr.,* guardian and trustee ad litem, p. p., contra.

KLEIN, J., November 28, 1947.—In consideration for the execution by Lillian Seixas (Lewis) of a release in favor of Carl J. Wolters, testator's son, from liability in connection with a threatened suit for breach of promise of marriage, testator, Charles A. Wolters, on June 3, 1935, transferred 3,000 shares of the common stock of the United Gas Improvement Company to the Pennsylvania Company, etc., and George Ovington, Jr., as trustees, for the purpose of providing "an income of $225 per month to the said Lillian Seixas, beneficiary, for the term of her natural life . . .," If the income should become insufficient to meet these payments, the trustees were directed to "call upon" settlor to make up the deficiencies, and upon his failure to respond to the call they were directed to pay the amount of the deficiency out of principal and "call upon the settlor to deposit additional securities with the trustee . . . to the amount of securities sold or appropriated for income purposes".

Settlor has died and trustees under the deed presented a claim against his estate at the audit of his executor's account for a deficiency in the principal of the trust, representing the extent to which they were obliged to invade principal to meet income deficiencies. The auditing judge, in a carefully reasoned adjudication, held that settlor's individual estate is liable to the trust estate for the deficiency and awarded the sum of $5,316.11 to the trustees under the deed. He also decided that there is a continuing liability on settlor's individual estate for possible future deficiencies.

The deed of trust is a poorly drawn instrument. Its provisions in respect to the issue in controversy are ambiguous. The chief contention of exceptants, however, appears to be that the expression "call upon the

settlor to deposit additional securities" does not impose an obligation on the settlor to respond to the call.

The law is well settled that written instruments must be so interpreted that the intention of the parties, as gathered from the instrument in its entirety, may be given effect. No part of the instrument should be disregarded or treated as a nullity or surplusage, if that can be avoided. The rule applies with equal force to contracts: Moran v. Bair et al., 304 Pa. 471 (1931); wills: Hannach's Estate, 332 Pa. 145 (1938); and deeds of trust: Scott's Estate, 301 Pa. 509 (1930).

Furthermore, in endeavoring to ascertain the intention of settlor in the instant case, we must bear in mind that the creation of the trust was not his gratuitous act. The trust was established for a valuable consideration, to wit, the contemporaneous release by Lillian Seixas (Lewis) of her claim against settlor's son. Its purpose was to assure her a fixed income for the full term of her natural life.

We agree with the auditing judge that the words, "call upon", as used in the deed, mean "to demand or to ask for with authority, or as that to which one has valid claim". If we accept exceptants' contention, the phrase "call upon the settlor to deposit additional securities" becomes meaningless. If settlor was under no duty to respond to the call, the direction to make it was a futile and senseless gesture, and no useful purpose was served in inserting it in the deed.

Counsel have been unable to furnish us with reference to any decided case in this State in which the expression "call upon", as used in the present case, has been construed. However, we have found, as a result of our study, two cases decided in other jurisdictions which we think are helpful. In Taylor v. Coon, 79 Wisc. 76, 48 N. W. 123 (1891), the Supreme Court of Wisconsin, in construing similar language, said (p. 85):

"In the light of all the other stipulations in the agreement, which so clearly evidence the intention of the

parties thereto that the indemnity should only be against loss or damage, we think the subsequent words 'called upon to pay', as employed therein, should be construed as the equivalent of 'compelled or required to pay'. This construction makes the agreement consistent and harmonious in all its parts. It would not be so were we to read the latter clause 'asked or requested or pressed to pay'."

See also H. Koehler & Co. v. Reinheimer, 20 Misc. 62, 45 N. Y. Supp. 337 (1897).

Exceptants suggest that the purpose of the clause in question was to give settlor an opportunity to protect *his* UGI stock. An examination of the trust instrument discloses that once settlor executed it, he no longer had any control over this stock. The power to determine whether the stock should be retained was vested exclusively in the trustees. Furthermore, changes could be made by the trustees in the trust portfolio, but only with the written consent, not of settlor, but of Lillian Seixas. Although settlor had retained the power of appointment by will over the corpus of the trust, he had irrevocably surrendered the right to determine what specific investments should be retained by the trustees. To say that the purpose of the clause in question was to enable settlor to determine whether his UGI stock should be protected is flying in the face of the clear import of the deed.

We are further fortified in our conclusions by the presence of the following language in the deed:

"In the event of the prior decease of the Settlor hereunder, Charles A. Wolters, it is expressly understood that the terms of this Deed of Trust *shall be strictly adhered to by his heirs, executors, administrators and assigns. . . .*" (Italics supplied.)

If we adopt exceptants' views, this language must also be disregarded as meaningless. The only possible obligation that settlor had assumed under the deed was to make up deficiencies in principal. In all other

respects, he had fully met his responsibilities by depositing the UGI stock with the trustees. The only manner in which we can give meaning to this clause and not disregard it as surplusage is to hold that settlor, in his lifetime, and his personal representatives after his death, were under a duty to make up any deficiency in principal which might occur as a result of diminution of the income below the $225 per month guaranteed to the beneficiary.

Exceptions were also filed by Mr. Latta, on behalf of Carl J. Wolters, administrator of the estate of Eleanor Ida Wolters Gross, testator's deceased granddaughter, raising two questions involving the construction of testator's will. We are all of the opinion that there is no merit to these exceptions and that the questions raised by them have been fully and properly disposed of in the adjudication.

The exceptions are therefore all dismissed and the adjudication confirmed absolutely.

BOLGER, J., dissenting opinion, November 28, 1947. —The conclusion that settlor agreed to pay the life tenant the monthly sum of $225 for her life erroneous. The deed of trust recites that it is the trustees' obligation to make these payments out of income derived from the trust res, if the corpus be inadequate, then to call upon settlor, who has a reversionary right in the res, to make up the deficiency. If after 60 days he has failed to do so, then trustees shall invade principal to make the payments, at the instance of the life tenant.

Resting the full weight of the decision upon the interpretation of the word "call" is fatal error, considering its admitted equivocal meaning, its position being among the enumerated powers of the trustees and not an express promise or obligation of settlor or among the purposes of the trust. This misplaced reli-

ance stems from the failure to place the weight where it properly belongs, i. e., on the language defining the purpose of the trust. The majority opinion recites part of this purpose in its opening paragraph, but fails to state it fully. For emphasis, let me repeat it:

". . . it being the purpose of this Trust to provide an income of Two hundred and twenty-five Dollars ($225.00) per month to the said Lillian Seixas, beneficiary, for the term of her natural life, and to further provide that in the event of any deficiency of income Trustees shall make up any deficiency out of principal, at the demand of the aforesaid beneficiary, Lillian Seixas."

The majority enlarges upon this express clause by unjustifiably reading into it a personal obligation of settlor.

In Hild v. Dunn, 310 Pa. 289, 293, are enunciated several principles always employed in the construction of contracts.

" 'An agreement is the assent of two minds to the same thing. It should be construed in the light of the facts and circumstances under which the parties contracted. These form a sort of context that may properly be resorted to as an aid in interpreting the contract, to the end that the object and purposes of the parties may be carried into effect. . . . It is axiomatic that all contracts must be construed with reference to their subject matter and obvious purposes, and, however general the language may be, their scope and effect are necessarily so limited and controlled.' "

In Alcorn Combustion Co. v. Kellogg Co., 311 Pa. 270, the syllabus reads:

"5. The general language of one paragraph of a contract will be limited, where it is necessary so to do, in order to give to other paragraphs their necessary effect."

In Commonwealth v. Nelson-Pedley Construction Company et al., 303 Pa. 174, 185, "nothing can be in-

ferred which is in direct violation of that which is clearly expressed . . . because . . . it cannot be assumed that repugnant or contradictory clauses were intended to be inserted in the contract." We should not, therefore, give to the word "call" a connotation which is repugnant to, extends, or circumvents the purpose clause, which is clearly expressed.

In Johnson v. Ritter, 111 Pa. Superior Ct. 482, plaintiff sued on a contract in which defendant made him his exclusive agent at a fixed commission to sell a certain piece of real estate at a fixed price whether the property was sold by the agent or by defendant. Defendant sold the real estate at a lower price. Plaintiff sued for the rate of commission on the actual sale price. The Superior Court sustained the nonsuit granted by the lower court stating that the sale as made was not within the written terms of the contract and that the result of adopting the construction of the contract suggested by appellant would be to give the contract a meaning opposed to the obvious purpose of limiting plaintiff's power to sell at a specified price. In Hild v. Dunn, supra, and Commonwealth v. Nelson-Pedley Construction Co., supra, the courts refused to enforce contracts similarly lacking in express terminology.

Here the parties wanted to dispose definitely and finally of their controversy in a businesslike way. Mr. Wolters, settlor, was settling a claim against his son for damages for breach of promise of marriage and in consideration of the release of the son. It is a contract made to answer for the default of another and should, therefore, be strictly construed. The minds of the parties met on a monthly sum and they fixed a definite manner of determining whence it should be derived—from the UGI stock. As an ordinary prudent person, the life tenant did not want to leave anything to speculation, such as the settlor's continued solvency, in order to secure that income. She would have insisted

that the corpus be increased had she felt it were inadequate. Security was her purpose. Settlor naturally did not want to expose himself to future additional liability, but at the same time he desired to secure the return of the collateral when the life tenant died. We can, therefore, reasonably assume that if these parties anticipated the possibility of the collateral being insufficient to yield the stipulated income and that the settlor should become personally liable to make up any deficit they would have said so: Hild v. Dunn, supra, pp. 294, 295. It cannot be denied that such provision would have been an unusual one; it would have left the contract an open one, a possibility which settlor would seek to avoid. Their failure to expressly provide for it is the most eloquent fact in this controversy. In striking contrast is the Estate of Albert R. Gallatin Welsh, 2016 of 1942, now before the court, where the issue involves a separation agreement between husband and wife and the main element is the presence of the express undertaking of the husband to support his wife for the duration of her life or widowhood.[1]

The parts of the contract upon which the adjudication and the majority opinion rest deal only with the operation of the contract and not with its purpose. "Call" is included among the powers of the trustees and is declared ambiguous by the adjudication and the majority opinion and its meaning is extended to an expansion of the purposes of the trusts. I disagree with that construction. The word is sometimes used in the same sense of assessment or of notice or privilege. But all of the authorities that I have examined, including the Wisconsin and New York cases cited in the majority opinion, give it the meaning of assessment only when it is tied to some primary express obligation—that is in a relative, independent or conditional sense. For instance, in 1 Webster's International Dictionary, 2nd edition, 380:

[1] Welch's Estate, 61 D. & C. 47.

"13. *Finance.* (a) A demand for the payment of money; esp. a notice to a stockholder, member of a mutual insurance company, etc., to pay an installment of subscription . . . or a contribution toward certain losses, etc.; an assessment. (b) a demand for presentation for payment, as of a bond."

Another connotation of "call" and one which accords largely with the use employed in the majority opinion and which is consistent with my conclusion is "demand" but only in the sense of election or option. When a "call" was made upon settlor, it created in him an election to make up any deficiencies of income from his private means or to suffer the invasion of the corpus in which he had the reversionary right. In either event he would suffer the detriment that the majority opinion finds inherent in the term, but it does not follow that settlor had to supply further funds. If this process resulted in the exhaustion of the corpus, there does not appear to be any other recourse against settlor. The situation is like that of a collateral loan, lacking however the primary obligation of a promissory or judgment note upon which suit could be brought. In many cases when the phrase stands alone, it is given the connotation of notice or of privilege. It is conceded that here there is no independent or primary obligation of settlor to respond to the call or any correlative express right of the trustees or of the life tenant which is tied to or to which it relates. It cannot, therefore, be said to bind settlor to respond to the call other than as above outlined. Under the authority of Alcorn, etc., v. Kellogg, supra, the interpretation of this word must be limited to demand in the sense of election or option, because such limitation is necessary to give effect to the express intention of the parties in the purpose clause.

The majority opinion attaches great importance to the phrase binding settlor's successors to the deed. This clause is of secondary importance and must like-

wise be subordinated to the main purpose of the parties. Flying in the face of the foregoing authorities, the majority opinion maintains that this clause implies an obligation on the part of the appointees or of the next of kin of the settlor to make up any deficit in income or principal, otherwise the provision is without meaning. This clause was plainly inserted to serve a very real purpose, to act as a protection for the trustees against surcharge and to insure them adequate powers to function. These powers are, among others, to invade principal in order to meet delinquencies in monthly payments when, as and if settlor failed to meet "calls", to sell, invest and reinvest in "non-legals", to fix the trustees' commissions, to purchase at premium or discount, to subscribe for stock or bond privileges, etc.

This settlor must have had a peculiar liking for UGI stock as an investment, a perfectly normal belief. He, therefore, attempted to give himself the opportunity to protect his reversionary right in that investment by requiring that he receive notice of any default of income yield from the stock and that he have 60 days in which to protect that interest if he so desired. The parties employed the word "call" to protect that right. It is ironic that the word is now employed as a weapon of attack upon him when it was intended to afford him a measure of protection. The majority opinion dismisses this contention without full consideration of its importance. The reason is clear why the majority opinion characterizes the trust as a poorly drawn instrument. However, when it is given the construction herein portrayed, it becomes a well drawn instrument. Therefore, the present interpretation is to be preferred.

Even though the language of this deed be susceptible of the two constructions, it is submitted that the foregoing one is the more reasonable and it is, therefore, to be preferred: Navarro v. Pittsburgh School District, 344 Pa. 429. In Hempfield School District v. Cavalier

et al., 309 Pa. 460, it is held that a construction which makes one of two possible results fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, that interpretation which makes the natural and probable agreement must be preferred.

The exceptions should be sustained.

President Judge Van Dusen joins in this dissent.